RATH *v.* KELLY.

1. ACCOUNTING — CONTRACTS — SAWING LUMBER — CUSTOMS AND USAGES.

In a suit for an accounting of the profits of a joint enterprise in manufacturing and selling lumber, where the contract provided that defendants were to be allowed $7 per thousand feet for sawing and selling, but was silent as to whether said price included the expense of unloading the logs at their mill, and no general custom was proven, an allowance of $2 per car therefor by the trial court is affirmed, on appeal.

2. SAME—INCOME TAXES PAID BY PARTNERS NOT ALLOWABLE.

A claim for plaintiff's proportionate share of income taxes paid by defendants, copartners, was properly disallowed, since said partners are liable therefor as individuals on their individual income, and payment thereof is not a proper charge against plaintiff.

3. SAME—OFFICE SELLING CHARGE NOT ALLOWABLE WHERE COVERED BY CONTRACT.

An office charge for the sale of ties, boxwood, and pulpwood, into which some of the logs were cut, was properly disallowed, since they are included in the products manufactured from the logs, the sale of all of which was provided for in the contract.

4. Same—Damages Incident to Delay Not Allowable in Absence of Proof of Damage.

Plaintiff's claim for damages incident to defendants' delay in manufacturing logs into lumber was properly disallowed, in the absence of proof that he was damaged thereby.

5. Same—Shortage—Proofs.

Plaintiff's claim for shortage, in that defendants did not account for all of the lumber manufactured from the logs shipped to them by plaintiff, sustained by testimony as to estimates and scales only, was properly disallowed, where defendants showed by direct evidence that said logs were kept separately, sawed separately, piled separately, and sold separately.

6. Partnership—Uniform Partnership Act—Liability of Individual Partner for Partnership Debt.

In a suit by an individual for an accounting, defendants' claim against a partnership, of which plaintiff was alleged to be a member, was properly disallowed; it not being a debt for which he was individually liable under section 15 of the uniform partnership act (Act No. 72, Pub. Acts 1917).

Appeal from Chippewa; Fead (Louis H.), J. Submitted January 19, 1929. (Docket No. 20, Calendar No. 33,740.) Decided March 28, 1929.

Bill by Herman G. Rath against Martin Kelly and John Kelly, copartners as Kelly Lumber Company, for an accounting. From the decree rendered, both parties appeal. Affirmed.

*Davidson & Hudson,* for plaintiff.

*John W. Shine,* for defendants.

Sharpe, J. The parties hereto entered into a contract on October 21, 1918, under which the defendants advanced $10,000 to purchase certain timber limits on which plaintiff had an option. They also agreed to advance the money to lumber it, to saw the logs cut therefrom into lumber at their mill in Sault Ste. Marie for $7 per thousand feet, and to make

sale of the lumber. Plaintiff was to oversee the woods operations. After payment of advances and expenses by defendants, the profits or losses were to be divided equally between them. The timber was cut and delivered at defendants' mill in 1919 and 1920. The sawing was not completed until in 1921. All of the lumber was not sold until 1926.

In this suit plaintiff seeks an accounting of the proceeds of the enterprise. Both parties appeal from the decree entered in the trial court. We will consider the items in dispute in the order discussed by counsel.

1. *Unloading Charges.* The cars on which the logs were loaded in the woods were run out on a trestle at defendants' mill, and dumped into the river in booms. The defendants charged $2 per car for unloading in 1919, and $5 in 1920. Plaintiff contends that the expense of unloading was included in the allowance for sawing. The contract is silent concerning it. No general custom was proven. The trial court found $2 to be a fair charge for unloading in both years, and allowed the defendants therefor. We approve this action.

2. *Income Tax.* Defendants seek to charge plaintiff with $336.70, Federal income tax paid by them in 1919 and 1920. This was based on plaintiff's proportionate share of the profits as disclosed by their books. While a partnership must report its profits, the members must individually report the share received by each of them, and their liability to pay is fixed by their individual tax return. Any payment thus made by defendants is not a proper charge against the plaintiff. The taxes provided for in the contract were those assessed on the lands from which the logs were cut. This item was properly disallowed.

3. *Office Charges.* Some of the logs were cut into ties, boxwood, and pulpwood. Defendants seek to charge plaintiff with 5 per cent. of the sale price of these products for office work incidental to the selling and making collections therefor. The contract provided that the defendants "shall have the selling of all products and shall collect all moneys from the sale of said products." This clearly included all of the products manufactured from the logs delivered, and the charge therefor should not have been, and was not, allowed.

4. *Delay in Sawing.* Certain of the logs delivered in 1920 were not manufactured into lumber until the spring of 1921. Plaintiff claims damages incident to the delay. There was proof that the logs that year were not delivered in quantities to keep the mill running, and for that reason other contracts for sawing were entered into to avoid a shut down. There is also proof that most of the lumber manufactured in 1920 was carried over until 1921 on account of the low price thereof. It does not appear that plaintiff was in any way damaged by the delay. This claim was properly disallowed.

5. *Shortage.* Five thousand five hundred and ninety-four logs were delivered at the mill in 1919, and 19,793 in 1920. From these, defendants reported a cut in 1919 of 249,600 feet of lumber, and in 1920 of 792,570 feet. The average number of feet in each log cut in 1919 was $44\frac{2}{3}$ feet, and, in 1920, 40 feet. It is plaintiff's claim that the proofs, based on estimates and log scale of a part of the logs, show that the scale of the lumber should have shown 329,024 feet in 1919, and 1,682,745 feet in 1920, a total shortage of 962,432 feet, and that he should be allowed therefor.

These figures are somewhat staggering, and, if plaintiff's claim be supported by sufficient competent proof, it leads to the unavoidable conclusion that defendants deliberately misappropriated almost one-half of the lumber manufactured. Plaintiff had proof of apparently competent estimators that it was a good tract of timber, mostly jack pine, some spruce and Norway and white pine, and that the logs would run from 14 to 20 to the thousand, and that the timber cut in 1920 was better than that cut in 1919. Raymond Peterson was requested by plaintiff to make an average scale of about 20,000 logs banked on the railroad in 1920. He scaled 303 logs, "a fair average of the entire cut." The logs averaged 61 feet log measure. He testified that "it was a better run of timber in size" than that cut in 1919. On cross-examination he was asked: "Do you remember what per cent. you threw out for crooks and defects?" and answered, "I do not. I took the diameters and computed the feet." There was also proof of tests made in sawing logs somewhat similar in size and character at other mills.

Opposed to this, defendants had proof of estimates made by men apparently as competent and reliable, which it may be said fairly rebutted this claim. There was testimony that jack pine "is generally more or less defective. It is generally crooked, more so than white pine or Norway;" that "the whole would run from 30 to 35 to the thousand;" that "one-third of the general run of jack pine will be crooked." Defendants' mill and yard foreman testified:

They were a pretty poor bunch of logs. They were small, the jack pine was very small. * * * There was a lot of red rot. I would figure that in the jack pine about 30 per cent. had red rot, ring rot. * * *

As a rule we couldn't tell from the ends whether it was worth sawing or not. It had to be run through the saw to show what lumber could be sawed. Some could not be made into lumber; they wouldn't stand handling."

He also testified that "those logs came in and were kept separately, sawed separately and piled separately." He was corroborated in this statement by the testimony of both of the defendants. The testimony of J. L. Lynch, an experienced cruiser, scaler, and mill man, is illuminating. He said:

"There is more to scaling than simply putting the rule on the end of a log and setting the measurements down. You have to have judgment to know what the log will cut out. You have to get that experience by practical experience. A log may have a certain sized top and yet have nothing in it. If the log is crooked and small it is really only good for lath and small mills don't have lath cutters and if the log is crooked and there is no merchantable timber in it, the cull log goes to the wood pile. Another defect is rot."

We have no doubt that plaintiff's claim for shortage is made in good faith. We fully appreciate the statement of his counsel that direct proof on his part of the actual cut is impossible. There is, however, direct proof that these logs "were kept separately, sawed separately and piled separately," and "kept separate in selling also." To sustain this claim, we must eliminate the testimony of the defendants and of their yard and mill foreman as unworthy of belief. We should be loath to do this, particularly in view of what thereafter occurred.

Plaintiff's first complaint of shortage was made to defendants in a letter written on June 13, 1921. In reply thereto defendants assured him that—

"the lumber was sawed and piled separate, and that practically all the lumber from the 1920 logs is still in pile here. The very few cars of this stock which were shipped we have account of and very likely Mr. Weimer who scaled and shipped this lumber also has an account of it."

The letter contained an invitation to plaintiff to visit their yard and check up the lumber, and an offer to assist him in doing so. Plaintiff did not avail himself of the opportunity thus afforded him of at least endeavoring to ascertain whether there was a shortage in fact. He chose to rely entirely on the estimates and scales which he had caused to be made. We are in accord with the conclusion reached by the trial court as thus stated:

"It is the opinion of this court that, before estimates and scales can be permitted to prevail over records regularly kept in the due course of the enterprise business, there must be some extraneous evidence of malfeasance, of mistake in the records, or of lack of opportunity, through trust, prevention, interference, or otherwise, to ascertain the facts. This principle is enunciated and applied in *Wisconsin Sulphite Fibre Co.* v. *Jeffris,* 111 N. W. (Wis.), 242. There is no such evidence in this case. This claim is not allowed."

6. *Rath Brothers Items.* There were negotiations in 1926 which ended in the sale of defendants' mill property and stock on hand to a partnership known as "Rath Brothers." Defendants claim that plaintiff was a member of this firm, and seek to charge him in this accounting with certain items claimed to be due them by the partnership. There was evidence tending to show that plaintiff was a member of the partnership. He and his brother William, who was a member, testified that he was not. Sec-

tion 15 of the uniform partnership act (Act No. 72, Pub. Acts 1917 [Comp. Laws Supp. 1922, § 7966(15)]) specifies the cases in which a partner is individually liable for the debts of the firm. This question was before us in the recent case of *Soberg* v. *Sanders*, 243 Mich. 429. The holding in *Stewart* v. *Terwilliger*, 177 Mich. 313 (Ann. Cas. 1915 C, 808), is squarely in point, and justified the disallowance of the claim.

The decree is affirmed. As both parties have appealed, no costs will be allowed.

NORTH, C. J., and FELLOWS, WIEST, CLARK, MC-DONALD, and POTTER, JJ., concurred. FEAD, J., did not sit.